## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT BECKLEY

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 5:24-cr-00031-3

DAEMIEN THOMPSON

### MEMORANDUM OPINION AND ORDER

Pending are Defendant Daemien Thompson's objections to the Presentence Investigation Report ("PSR"). Mr. Thompson objects to paragraph 46, asserting the career offender enhancement is inapplicable. He further objects to paragraphs 9, 24–26, 28–30, 35, and 37–40, challenging certain drug weight attributed to him by co-defendant John Gray. Mr. Thompson contests the reliability of Mr. Gray's statements to law enforcement as "false," "inconsistent," and "unreliable." [ECF 402; *see also* ECF 407 at 2–6; ECF 435]. The matter is ready for adjudication.

### I.

On February 13, 2024, an Indictment was returned against Mr. Thompson, charging him with Conspiracy to Distribute 50 Grams or More of Methamphetamine, its Salts, Isomers, and Salts of its Isomers, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 846 (Count One) and Aiding and Abetting the Distribution of Five Grams or More of Methamphetamine, its Salts, Isomers, and Salts of its Isomers, a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two). On May 7, 2025, Mr. Thompson, by written plea agreement, [*see* ECF 342], pled guilty to Count One and thus stands convicted. [*See* ECF

339].

A sentencing hearing was scheduled for September 26, 2025, but, following receipt of a Supplemental Memorandum from Mr. Thompson, [*see* ECF 402], the Court continued the hearing pending the conclusion of the supplemental briefing on Mr. Thompson's objections. On September 29, 2025, the Government responded, [ECF 403], to which Mr. Thompson replied on October 2, 2025. [ECF 407]. Mr. Thompson subsequently filed a Second Supplemental Memorandum regarding the unreliability of Mr. Gray's statements, principally based upon various recorded telephone calls between Mr. Gray and others while he was incarcerated at South Central Regional Jail. [*See* ECF 435].

On January 8, 2026, all counsel and Mr. Thompson appeared for a sentencing hearing. [ECF 439]. The Court recessed to afford Mr. Thompson time to consider, with his counsel's input and guidance, whether to pursue withdrawal of his plea agreement. [*See id.*]. The Court directed the parties to submit additional briefing addressing the outstanding objections. [ECF 443]. The sentencing hearing was rescheduled for March 25, 2026, pending the conclusion of the supplemental briefing on Mr. Thompson's objections. [*Id.*]. Thereafter, Mr. Thompson filed his Third Supplemental Memorandum, [ECF 448], to which the Government responded, [ECF 450], and Mr. Thompson replied. [ECF 452].

On March 25, 2026, all counsel and Mr. Thompson appeared for a sentencing hearing. [ECF 457]. The Government called Mr. Gray and Agent Mark Gunther to testify. [*See* ECF 461]. Mr. Gray testified regarding (1) controlled substance amounts attributed to Mr. Thompson, and (2) when Mr. Thompson's participation in the conspiracy terminated. [*See id.*]. At the hearing, Mr. Thompson stated he did not intend to pursue withdrawal of his plea agreement. [*Id.* at 81]. The sentencing hearing was rescheduled for May 19, 2026, pending receipt of

supplemental briefing by the Government addressing its position regarding Mr. Thompson's late-rising objections as to whether (1) conspiracy pursuant to 21 U.S.C. § 846 qualifies as a controlled substance offense, and (2) whether Mr. Thompson's conviction for Sexual Assault in the Third Degree is considered a predicate offense. [*See* ECF 459]. On April 23, 2026, the Government filed its supplemental brief addressing the remaining issues. [ECF 460].

Mr. Thompson first objects to application of the career offender enhancement. [*See* PSR Addendum at 39–43; ECF 445 at 12–14; ECF 448 at 4–8; ECF 452 at 8–11, 14–16]. Second, he contests certain drug weight attributed to him by co-defendant John Gray's statements to law enforcement. [*See* PSR Addendum at 32, 34–39; ECF 402; ECF 407; ECF 435; ECF 448; ECF 452 at 1–5]. The Government urges application of the career offender enhancement is appropriate and asserts the co-defendant statements are reliable and sufficient to meet the preponderance standard. [ECF 403 at 3–5; ECF 450 at 2, 6–9; ECF 460 at 2–8; *see generally* ECF 461].

## II.

### A.    *Career Offender Enhancement*

#### 1. Governing Standard

United States Sentencing Guidelines ("Guidelines") § 4B1.1(a) provides for a career offender enhancement if: "(1) the defendant was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a).

"[T]o determine whether a conviction qualifies as a predicate offense under the Sentencing Guidelines," courts apply the categorical approach. *United States v. Cannady*, 63 F.4th

3

259, 266 (4th Cir. 2023) (citing *United States v. Norman*, 935 F.3d 232, 237 (4th Cir. 2019)); *see also United States v. McCollum*, 885 F.3d 300, 304 (4th Cir. 2018) ("A defendant may not receive an enhanced sentence merely because the label attached to his crime of conviction is listed in the [Guidelines]. Instead, an enhanced sentence is lawful only if the prior conviction necessarily establishes that the defendant 'has been found guilty of all the elements' of the enumerated offense." (quoting *Taylor v. United States*, 495 U.S. 575, 599 (1990))).

"When evaluating a defendant's prior conviction for an inchoate offense listed in the commentary to § 4B1.2(a),[1] 'two sets of elements are at issue: the elements of [the inchoate crime] *and* the elements of the underlying . . . offense.'" *McCollum*, 885 F.3d at 304–05 (quoting *United States v. Dozier*, 848 F.3d 180, 185–86 (4th Cir. 2017)). "Both the inchoate crime and the underlying offense are subject to *Taylor*'s categorical approach." *Id.* at 305; *see also Baptista v. Bondi*, 136 F.4th 174, 178 (4th Cir. 2025) (citing *id.* at 304–05) (Courts "deploy this analysis twice for attempt offenses, once for the offense that is the object of the attempt, and once for the attempt itself. . . . The object of the attempt . . . must categorically match a generic federal offense."). "An enhanced sentence may follow a conviction for an inchoate crime only if the defendant's conviction necessarily establishes that he was found guilty of a crime whose elements encompass both the generic inchoate crime and the generic underlying crime." *McCollum*, 885 F.3d at 305.

---

[1] At the time *United States v. Dozier*, 848 F.3d 180, 185–86 (4th Cir. 2017), and *United States v. McCollum*, 885 F.3d 300, 304 (4th Cir. 2018), applied the categorical approach to various inchoate offenses, the inchoate offenses were listed in the Guidelines commentary. *See* U.S.S.G. § 4B1.2 n.1 (2014) ("'Crime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."); U.S.S.G. § 4B1.2 n.1 (2016) (same). Following the adoption of the 2023 Guidelines, however, inchoate offenses are now listed in the Guidelines text in § 4B1.2(d). *See* U.S.S.G. § 4B1.2(d) (2023) ("INCHOATE OFFENSES INCLUDED.—The terms 'crime of violence' and 'controlled substance offense' include the offenses of aiding and abetting, attempting to commit, or conspiring to commit any such offense."); U.S.S.G. § 4B1.2(d) (2025) (same).

The categorical approach analysis proceeds as follows. "First, [the Court must] determine the 'generic' definition of the predicate offense." *Cannady*, 63 F.4th at 266 (citation omitted). "Second, [the Court must] compare the elements of the generic offense to the elements of the defendant's conviction." *Id.* (citation omitted). "If the defendant's conviction 'criminalizes conduct broader than that encompassed by the generic offense, then the conviction does not categorically qualify under the Guidelines.'" *Id.* (citation omitted); *see McCollum*, 885 F.3d at 304 (internal quotation marks omitted) (quoting *United States v. Cabrera–Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013) ("The point of the categorical inquiry is not to determine whether the defendant's conduct *could* support a conviction for a crime of violence [or a controlled substance offense], but to determine whether the defendant was *in fact convicted* of a crime that qualifies as a crime of violence [or a controlled substance offense].")).

### 2. Argument and Analysis

Mr. Thompson contends application of the career offender enhancement is inappropriate for the following three reasons: (1) the instant § 846 offense is not a controlled substance offense, [ECF 448 at 4–5], (2) the Third Degree Sexual Assault conviction in paragraph 56 is not an appropriate predicate offense, inasmuch as (i) he received only a $1,000 fine and no term of imprisonment, meaning "the guilty plea to sexual assault third degree on August 5, 2008, is outside the ten (10) year applicable time period," [PSR Addendum at 49], and (ii) even if counted timing-wise, it is not a crime of violence, [ECF 452 at 8–11], and (3) the Delivery of a Controlled Substance- Cocaine offense is not a controlled substance offense inasmuch as it is foreclosed by *United States v. Campbell*, 22 F.4th 438 (4th Cir. 2022), because the criminal conduct he pled guilty to occurred prior to the November 1, 2023, enactment of the 2023 Guidelines, [PSR Addendum at 44; ECF 445 at 12–14; ECF 448 at 6–8; ECF 452 at 14–16].

The Government responds application of the career offender enhancement is appropriate inasmuch as (1) the instant § 846 offense is a controlled substance offense, [ECF 460 at 2–5], and (2) Mr. Thompson has at least two qualifying predicate convictions of either a crime of violence or a controlled substance offense; namely, his convictions for Unlawful Assault and Delivery of a Controlled Substance-Cocaine, [*id.* at 5–8; ECF 450 at 2, 6–9]. Regarding the latter, the Government urges *Campbell* is inapplicable as a result of amendments to the Guidelines. [ECF 450 at 6–7]. The Government concedes Mr. Thompson's sexual assault third degree offense does "not count as a predicate offense for purposes of determining defendant's status as a career offender" because it was imposed more than 10 years prior to the instant offense. [ECF 460 at 7 (citing U.S.S.G. § 4A1.2(e))].

### a. Instant Offense of Conviction -- 21 U.S.C. § 846

It is undisputed Mr. Thompson satisfies the first requirement of the career offender enhancement. He was at least 18 years old at the time he committed the instant offense of conviction. *See* U.S.S.G. § 4B1.1(a)(1). The second requirement obliges the Court to consider whether the instant offense of conviction -- conspiracy to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers, a schedule II controlled substance, in violation of 21 U.S.C. § 846 -- is a controlled substance offense. Mr. Thompson asserts 21 U.S.C. § 846 may not serve as a predicate controlled substance offense based upon *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), and *United States v. Cannady*, 63 F.4th 259 (4th Cir. 2023). [ECF 448 at 4–5].

The decisions in *Norman* and *Cannady* rest upon *United States v. McCollum*, in which the United States Court of Appeals for the Fourth Circuit analyzed whether a defendant's prior conviction for conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C.

6

§ 1959(a)(5) was categorically a crime of violence. 885 F.3d 300, 303–09 (4th Cir. 2018). Applying the categorical approach, but lacking a definition of conspiracy within Guidelines § 4B1.2, our Court of Appeals reasoned the meaning of "conspiracy" under Guidelines § 4B1.2 turned on the "crime's contemporary meaning." *Id.* at 308 (second emphasis added) (noting the "settled principle of statutory construction that . . . Congress intends to adopt the *common law* definition of statutory terms, . . . [whereas the Sentencing] Guidelines written by the [United States] Sentencing Commission, [] require[] [courts] to consider a crime's *contemporary* meaning").

In *McCollum*, our Court of Appeals adopted the position of the United States Court of Appeals for the Ninth Circuit, noting that "thirty-six states, the District of Columbia, Guam, Puerto Rico, [] the Virgin Islands[, and the general federal conspiracy statute] define conspiracy to require an overt act." *Id.* (citing *United States v. Garcia–Santana*, 774 F.3d 528, 534–35 (9th Cir. 2014)); *see also id.* (citing *Rangel–Castaneda*, 709 F.3d 373, 376 (4th Cir. 2013)) (concluding a definition adopted by thirty-two states established a "broad consensus" "sufficient to establish the generic, contemporary definition"). Our Court of Appeals concluded the contemporary definition of conspiracy requires an overt act. *Id.* Therefore, inasmuch as conspiracy to commit murder in aid of racketeering did not require an overt act, whereas the contemporary definition of conspiracy did require an overt act, our Court of Appeals further concluded the conspiracy statute at issue "criminalize[d] a broader range of conduct than that covered by generic conspiracy" so it could not "support [an] enhanced sentence because it [was] not categorically a crime of violence." *Id.* at 309.

In *Norman*, our Court of Appeals extended *McCollum*'s rationale regarding the lack of a definition for conspiracy in Guidelines § 4B1.2 to a conviction for conspiracy to possess

cocaine and cocaine base with intent to distribute in violation of 21 U.S.C. § 846 -- concluding it was not categorically a controlled substance offense. 935 F.3d at 237. Relying on *McCollum*, our Court of Appeals reasoned defendant's prior § 846 "conspiracy conviction does not qualify as a 'controlled substance offense' under the Guidelines" inasmuch as "the Guidelines do not define 'conspiracy' under § 4B1.2, [so] the term is defined by reference to the 'generic, contemporary meaning' of the crime," which requires an overt act whereas 21 U.S.C. § 846 does not. *Id.* (quoting *McCollum*, 885 F.3d at 308). Accordingly, inasmuch as "§ 846 criminalize[d] a broader range of conduct than that covered by generic conspiracy, [the defendant's] conviction under § 846" was not categorically a controlled substance offense and could not support the enhancement. *Id.* at 238.

Moreover, in *Cannady*, in the context of a 28 U.S.C. § 2255 appeal alleging ineffective assistance of counsel, our Court of Appeals concluded counsel deficiently failed to object -- based upon *McCollum* -- to the application of a career offender enhancement where the defendant was convicted of 21 U.S.C. § 846 offenses. 63 F.4th at 268. Our Court of Appeals in *Cannady* concluded the foregoing based on *McCollum*'s reasoning that the predicate conspiracy offense criminalized a broader range of conduct than §§ 4B1.1 and 4B1.2 inasmuch as the predicate conspiracy offense required an overt act, whereas the Guidelines do not require an overt act in furtherance of the conspiracy. *Id.* (citing *McCollum*, 885 F.3d at 309).

Accordingly, post-*McCollum*, *Norman*, and *Cannady*, a conspiracy conviction pursuant to 21 U.S.C. § 846 no longer qualifies as a controlled substance offense. *See, e.g.*, *United States v. Whitley*, 737 F. App'x 147, 149 (4th Cir. 2018) (quoting *McCollum*, 885 F.3d at 309 ("[B]ecause § 846 does not require an overt act, 'it criminalizes a broader range of conduct than that covered by generic conspiracy.' Accordingly, [the defendant's] prior § 846 conspiracy convictions cannot support his enhanced sentencing as a career offender because they are not

8

categorically controlled substance offenses."); *United States v. Davis*, 99 F.4th 647, 656 (4th Cir. 2024) (first citing *McCollum*, 885 F.3d at 308–09; and then citing *Norman*, 935 F.3d at 237–40) (acknowledging "a 21 U.S.C. § 846 conspiracy conviction . . . is not categorically a 'controlled substance offense' for purposes of the career offender [enhancement] because it does not require an overt act"); *see also, e.g.*, *United States v. Nicholson*, 787 F. Supp. 3d 254, 258 (E.D. Va. 2025) (citing *Norman*, 935 F.3d at 239) ("[A]fter *Norman*, [a] conspiracy conviction under 21 U.S.C. § 846 no longer qualifies as a 'controlled substance offense.'"); *United States v. Brown*, No. CR 3:17-350-JFA, 2025 WL 2719541, at *5 (D.S.C. Sept. 24, 2025) (quoting *Norman*, 935 F.3d at 239) ("In *Norman*, the Court found 'that because the definition of "conspiracy" in 21 U.S.C. § 846 is broader than the definition of the generic crime of conspiracy, [a] conspiracy conviction does not qualify as a "controlled substance offense" under the Guidelines.'").

In urging otherwise, the Government acknowledges *McCollum*, *Norman*, and *Cannady*, but declines to engage with the precedent. Instead, the Government asserts *McCollum*, *Norman*, and *Cannady* are no longer binding after the 2023 amendments to the Guidelines, which added "language into the [G]uidelines . . . previously . . . included in the commentary notes," including Guidelines "§ 4B1.2(d)[,] which adds that crimes of violence and controlled substance offenses include the inchoate offenses of aiding and abetting, attempting to commit, and conspiring to commit these crimes." [ECF 460 at 2–3]. According to the Government, "[i]t is clear the intention of the [S]entencing [C]ommission was to include Section 846 Conspiracy by amending the [G]uidelines to include the inchoate offense of conspiring to commit controlled substance offenses in the definition of controlled substance offenses." [ECF 460 at 5].

It is noteworthy that the Government's contention, namely, that a § 846 conspiracy should be considered a controlled substance offense because Guidelines § 4B1.2(d) names

conspiracy, is precisely the same argument rejected by our Court of Appeals in *Norman*:

> The Government . . . asserts . . . the Sentencing Commission intended to treat any relevant conspiracy crime as a controlled substance offense, regardless of whether it requires an overt act. Recall that the commentary states that "aiding and abetting, conspiring, and attempting" to commit a controlled substance offense meet the requirements of U.S.S.G. § 4B1.2(b). *But the commentary does not define those enumerated offenses for the purpose of determining whether a given "aiding and abetting, conspiring, or attempting" conviction qualifies as a controlled substance offense.* As we have explained, it is well settled that when the Guidelines simply name a type of offense without specifically defining it, nomenclature alone does not control; rather, we use the categorical approach to compare a potential predicate offense with the generic definition of the specified offense. *See McCollum*, 885 F.3d at 307–09 (applying categorical approach to define "conspiring" under § 4B1.2(b) to require an overt act); *Dozier*, 848 F.3d at 186–87 (applying categorical approach to define "attempting").

935 F.3d at 238 (emphasis added); *see also McCollum*, 885 F.3d at 304 ("A defendant may not receive an enhanced sentence merely because the label attached to his crime of conviction is listed in the [Guidelines]. Instead, an enhanced sentence is lawful only if the prior conviction necessarily establishes that the defendant 'has been found guilty of all the elements' of the enumerated offense." (quoting *Taylor*, 495 U.S. at 599)).

Despite the fact that our Court of Appeals has rejected the approach, the Government persists -- effectively seeking to sidestep the categorical analysis. However, the addition to the Guidelines text does not allow the Court to bypass the categorical analysis. True, the Guidelines text now states "INCHOATE OFFENSES INCLUDED.—The term[] . . . 'controlled substance offense' include[s] the offenses of aiding and abetting, attempting to commit, or conspiring to commit any such offense." U.S.S.G. § 4B1.2(d). But, critically, the categorical analysis remains the same. *See Cannady*, 63 F.4th at 266 (citation omitted) (directing courts to first "determine the 'generic' definition of the predicate offense" then "compare the elements of the generic offense to the elements of the defendant's conviction" and, "[i]f the defendant's conviction 'criminalizes conduct broader than that encompassed by the generic offense, then the

10

conviction does not categorically qualify under the Guidelines'").

Unsurprisingly, therefore, the rationale of *McCollum*, *Norman*, and *Cannady* remain unchanged by the transition of the language from the Guidelines commentary to the Guidelines text. Crucially, Guidelines § 4B1.2 still lacks a definition of conspiracy and "there is no single federal definition of conspiracy that we can assume the Commission intended to adopt." *See McCollum*, 885 F.3d at 306 (first citing 18 U.S.C. § 371; and then citing *United States v. Pascacio–Rodriguez*, 749 F.3d 353, 360–62 (5th Cir. 2014) (surveying statutes) ("The general federal conspiracy statute requires as an element an overt act. . . . At least fifteen federal conspiracy provisions for nonviolent crimes require an overt act, while at least ninety-nine do not . . . . Eight federal conspiracy provisions for violent crimes require an overt act, while forty-three do not.")).

So, as directed by the Supreme Court and our Court of Appeals, the Court first looks to the contemporary meaning of the word "conspiracy" to determine the "generic, contemporary meaning," *Taylor*, 495 U.S. at 598, of "conspiracy" under the Guidelines. *See McCollum*, 885 F.3d at 308; *see also Norman*, 935 F.3d at 237 (citing *Taylor*, 495 U.S. at 598). Given the fact that a majority of states, "the District of Columbia, Guam, Puerto Rico, the Virgin Islands, and the general federal conspiracy statute define[] conspiracy to require an overt act . . . the contemporary definition of conspiracy" likewise requires an overt act. *Cannady*, 63 F.4th at 267–68 (citing *McCollum*, 885 F.3d at 308). It is "undisputed that 'conspiracy' under § 846 does not require an overt act." *Norman*, 935 F.3d at 238 (citing *United States v. Shabani*, 513 U.S. 10, 11, 15 (1994) ("In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy.")). Therefore, as our Court of Appeals concluded in *Norman*, "§ 846 criminalizes a broader range of conduct than that covered by generic conspiracy," so Mr. Thompson's instant offense of conviction -- § 846

-- is not categorically a controlled substance offense. The additional language added following the 2023 Guidelines Amendments, *see* U.S.S.G. § 4B1.2(d), does not alter this outcome.

In further support of its position to the contrary, the Government cites an out-of-circuit authority that explicitly disagreed with the reasoning contained in *Norman*. *See United States v. Tabb*, 949 F.3d 81, 88 (2d Cir. 2020) ("The text and structure of Application Note 1 demonstrate that it was intended to include Section 846 narcotics conspiracy."). The United States Court of Appeals for the Second Circuit is free to "respectfully disagree" with *Norman*. *Id.* However, *McCollum*, *Norman*, and *Cannady* are binding on the Court, so *Tabb* is irrelevant.

### b. Qualifying Predicate Convictions

Mr. Thompson and the Government further contest whether he has at least two qualifying predicate convictions pursuant to Guidelines § 4B1.1(a)(3). [*See* PSR Addendum at 44, 49; ECF 445 at 12–14; ECF 448 at 6–8; ECF 452 at 8–11, 14–16; *see also* ECF 450 at 2, 6–9; ECF 460 at 5–8]. However, inasmuch as the second step of the career offender enhancement inquiry is outcome-determinative, the Court declines to further address the parties' arguments regarding potential predicate offenses.[2]

Accordingly, the Court **SUSTAINS** Mr. Thompson's objection to paragraph 46 of

---

[2] Mr. Thompson also makes two additional arguments that remain unaddressed. First, he makes a *Campbell*-based *ex post facto* argument urging application of the 2021 Guidelines inasmuch as the criminal conduct he stipulated to in his plea agreement (i.e., controlled buys on November 22, 2022, December 5, 2022, December 14, 2022, and February 2, 2023) all occurred prior to the adoption of the November 2023 Guidelines. [*See* PSR Addendum at 44; ECF 445 at 12–14; ECF 448 at 6–8; ECF 452 at 14–16]. He further asserts Mr. Thompson's participation in the conspiracy terminated on February 2, 2023, so he cannot be attributed the additional 680.4 grams of methamphetamine and 85.05 grams of fentanyl used in the PSR calculations. [*See* ECF 448 at 8–11]. The Court does not address the first argument inasmuch as the career offender enhancement inapplicable. Nor need it address the second argument inasmuch as the Court, *see infra* Section II.B, does not attribute the 680.4 grams of methamphetamine and 85.05 grams of fentanyl to Mr. Thompson based on the speculative nature of the calculations.

the PSR inasmuch as he does not satisfy the career offender requirements set forth in Guidelines § 4B1.1(a).

## B.    *Attributable Drug Weight*

### 1. Objections

Mr. Thompson objects[3] to paragraphs 24–26, 28–30, 35, and 37–40 of the PSR, which was most recently revised on March 20, 2026. Mr. Thompson contests the drug amounts attributed to him and the resulting base offense level calculation inasmuch as certain of his attributable drug weight results from co-defendant John Gray's statements to law enforcement. He contests the reliability of Mr. Gray's statements to law enforcement as "false," "inconsistent," and "unreliable." [ECF 402; *see also* ECF 407 at 2–6; ECF 435]. As a result of Mr. Gray's statements, the probation officer attributed to Mr. Thompson 50 pounds or 22,680 grams of methamphetamine, [PSR ¶¶ 24, 25; *see also* PSR ¶¶ 28, 30, 35, 37, 39–40 (calculating, in part, Mr. Thompson's attributable drug weight and resulting base offense level based on the 50 pounds attributed to him by Mr. Gray)], as well as "680.4 grams (24 ounces x 28.35 grams) of methamphetamine and 3 ounces or 85.05 grams (3 ounces x 28.35 grams) of fentanyl." [PSR ¶¶ 26, 29; *see also* PSR ¶¶ 30, 35, 37–40 (calculating, in part, Mr. Thompson's attributable drug weight and resulting base offense level based on the 680.4 grams of methamphetamine and 85.05 grams of fentanyl attributed to him by Mr. Gray)].

First, he contests 50 pounds of methamphetamine attributed to him based on Mr. Gray's statements that (1) Joshua Gray and Mr. Thompson "traveled together to 're-up' on methamphetamine," and (2) Mr. Gray witnessed "Joshua Gray and Thompson with approximately

---

[3] The drug quantities objected to do not include the November 27, 2022, December 5, 2022, December 14, 2022, or February 2, 2023, controlled buys amounting to 1765.41 grams of methamphetamine "ice." [*See* PSR ¶¶ 10–12, 13–15, 16–18, 19–22].

10 pounds of methamphetamine on approximately five occasions." [PSR ¶¶ 24, 25; *see also* PSR ¶¶ 28, 30, 35, 37, 39–40]. Next, he contests 680.4 grams of methamphetamine and 85.05 grams of fentanyl attributed to him based upon Mr. Gray's statement to law enforcement indicating, following the death of his brother, Joshua Gray, Mr. Thompson "continued to provide quantities of methamphetamine and fentanyl to John Gray to distribute for approximately three months," including "one ounce of methamphetamine approximately twice weekly for three months" and "one ounce of fentanyl, once monthly for three months." [PSR ¶¶ 26, 29; *see also* PSR ¶¶ 30, 35, 37–40].

## 2. Governing Standard

"Under the Guidelines, the drug quantities that may be attributed to the defendant include the quantities associated with the defendant's offense of conviction and any relevant conduct." *United States v. Flores-Alvarado*, 779 F.3d 250, 255 (4th Cir. 2015), *as amended* (Mar. 11, 2015). Pursuant to Guidelines § 1B1.3(a)(1), relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1).

"[A]t sentencing, the district 'court is entitled to find individualized drug quantities by a preponderance of the evidence, as part of its calculation of an advisory Guidelines range, so long as its resulting sentence is within the relevant statutory range.'" *United States v. Banks*, 104 F.4th 496, 522 (4th Cir.), *cert. denied sub nom. Davis v. United States*, 145 S. Ct. 338 (2024), and *cert. denied sub nom. Anderson v. United States*, 145 S. Ct. 563 (2024) (quoting *United States v. Brooks*, 524 F.3d 549, 562 (4th Cir. 2008)); *see also United States v. Williamson*, 953 F.3d 264, 273 (4th Cir. 2020) (citing U.S.S.G. § 2D1.1 cmt. n.5) (stating "[w]here there is no drug

seizure . . . [d]istrict courts enjoy considerable leeway in crafting" an approximation of the controlled substances at issue when calculating drug quantity for Guidelines purposes).

A court imposing a sentence may "consider any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Mondragon*, 860 F.3d 227, 233 (4th Cir. 2017) (cleaned up). "[T]he defendant bears an affirmative duty to show that the information in the [PSR] is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *Id.* (cleaned up). "[T]he government must prove the drug quantity attributable to a particular defendant by a preponderance of the evidence." *United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011). "[A]lthough [our Court of Appeals has] approved reliance on . . . hearsay testimony of lay witnesses as to the quantities attributable to a defendant, *see United States v. Cook,* 76 F.3d 596, 604 (4th Cir. 1996), [it has also] cautioned that when the approximation is based only upon 'uncertain' witness estimates, district courts should sentence at the low end of the range to which the witnesses testified." *Id.* (quoting *United States v. Sampson*, 140 F.3d 585, 592 (4th Cir. 1998)); *see also Williamson*, 953 F.3d at 273 ("District courts must . . . exercise caution in estimating drug quantity at sentencing[] and not attribute speculative or scantily supported amounts to defendants.").

### 3. Argument and Analysis

#### a. Reliability

Mr. Thompson asserts co-defendant John Gray (1) provided false statements to his probation officer while he was on bond, denying any drug use while awaiting sentencing despite submitting positive drug screens, and (2) provided inconsistent and unreliable statements during his interviews with law enforcement. [*See* ECF 402; ECF 407; ECF 435; ECF 448].

15

Mr. Thompson urges Mr. Gray's statements are inconsistent and unreliable for the following reasons. First, Mr. Gray initially told police on March 1, 2024, that he didn't know who his brother, Joshua Gray, was working with but, in a later interview on November 7, 2024, admitted his brother was working with Mr. Thompson, [ECF 402 at 2; ECF 407 at 2]. Second, Mr. Gray stated to police that he witnessed Mr. Thompson and his brother, Joshua Gray, with ten pounds of methamphetamine on approximately five occasions.

Mr. Thompson asserts the statement is unreliable for two reasons: (1) the rate and frequency of re-stocking does not align with the mere nine months Mr. Gray lived in West Virginia before his brother's death in December 2023, and (2) Mr. Gray, in a telephone call to his sister while he was incarcerated at SRJ, denied attributing that quantity to Mr. Thompson, [ECF 402 at 3–4; ECF 407 at 3; ECF 435 at 3 (Juanita Gray (sister): "Right. But he do got the statement, I seen it. The way it's wrote, the way they got that **** wrote up is like you saying that him and Doc was making trips every three months, and it was crazy. I said John's not said no **** like that." John Gray: "No, huh-uh. Hell no. I – why would I testify against something – that's crazy as hell.")]. Third, Mr. Thompson asserts the lack of text messages between Mr. Gray and Mr. Thompson -- despite Mr. Gray referring to the existence of text messages between himself and Mr. Thompson in his November 7, 2024, statement to police -- illustrate the unreliability of Mr. Gray's statements. [ECF 402 at 4; ECF 407 at 3]. Fourth, Mr. Gray minimized his then-girlfriend's involvement in drug trafficking activities, stating "[s]he don't be doing that. I mean she uses a little bit, but . . . she don't be doing too much. She just be chillin'" despite her prior felony drug conviction and his later admission during a recorded telephone call that she assisted him. [*See* ECF 402 at 4; ECF 407 at 3; ECF 402-1 at 21, 38–45; ECF 435 at 2 ("When I travel with shit, she's the one that holds the shit.")].

16

The Government responds (1) the alleged inconsistency between Mr. Gray's March 1, 2024, and November 7, 2024, statements is immaterial inasmuch as initial hesitancy to cooperate is common among co-defendants, [ECF 403 at 2 ("It is not uncommon for defendants to minimize their criminal conduct upon their first interaction with law enforcement. This includes the challenge of providing incriminating information regarding their associates.")], (2) Mr. Gray was deeply involved in the drug trafficking activity of the organization, which "places him in the best position to identify the participants in that activity as well as their roles," [*id.* at 4], (3) the fact that Mr. Gray lived in West Virginia for nine months prior to his brother's death does not preclude Mr. Gray from seeing his brother and Mr. Thompson with methamphetamine on approximately five occasions, and (4) Mr. Gray's denial regarding his cooperation with law enforcement does not render his statements unreliable because it is consistent with his likely desire to not be a target in prison, [*id.* at 5].

Mr. Gray's testimony was (1) candid, (2) neutral in tone, (3) moderately confident, (4) lacking defensiveness or hostility, and, (5) except as discussed below and with certain immaterial exceptions -- consistent with his prior statements to law enforcement. [*See generally* ECF 461 at 4–67].

Mr. Gray's denial of drug use while on supervised release awaiting sentencing and his failure to implicate his then-girlfriend as a participant in the conspiracy to law enforcement do not persuade the Court to disregard as inconsistent and unreliable his statements implicating Mr. Thompson. Though lamentable, instances of withholding among defendants are common, but the withholding is ultimately irrelevant to the instant inquiry regarding Mr. Thompson's attributable drug weight. Further, regarding the lack of text messages between Mr. Gray and Mr. Thompson, [*see* ECF 402 at 4; ECF 402-1 at 35; ECF 435 at 3–4; ECF 448 at 10; ECF 452 at 4], the Court is

persuaded by Agent Gunther's testimony regarding the fact that iMessages from iPhones do not appear on phone records whereas SMS messages do:

Q. Will iMessages show up on the phone records based upon the experience and training that you have in your investigations in other cases?

A. No.

Q. So iMessages won't show up?

A. No.

Q. So if somebody's messaging from iPhone to iPhone, will that typically be on an iMessage?

A. Typically. The only way that it would change would be if -- sometimes if there's poor service or something like that or if it's manually disabled on the phone, then it can be sent as an SMS message, then it will show up. But if it is sent as an iMessage, it will not show up on iPhone records.

Q. Again, based on your experience and training, do drug traffickers use the iMessaging platform and other platforms of that extent to their advantage?

A. Sometimes, yes.

Q. Knowing that there wouldn't be the phone records –

A. Yes.

Q. -- involved in that?

A. Yes.

Q. So are you surprised that there are no messages showing up on U. S. Cellular –

A. No.

Q. -- between those two?

A. No.

Q. John Gray said he had an iPhone?

A. Correct.

Q. Did you do subpoenas for information regarding the defendant's phones?

A. Yes.

Q. And what kind of phones did you find out through that subpoena that the defendant used?

A. There were three phones associated with the account. All three were iPhone 13s.

[ECF 461 at 73–74, *see also id.* at 10–11 (John Gray testimony representing he used an iPhone to text with Mr. Thompson)]. Accordingly, the lack of messages does not weigh against Mr. Gray's credibility.

Additionally, the alleged inconsistency between Mr. Gray's March 1, 2024, and November 7, 2024, statements to law enforcement -- that is, his declination to immediately cooperate and divulge information regarding co-defendants -- does not persuade the Court that his statements are inconsistent or unreliable inasmuch as initial hesitancy and fear is common. [*See* ECF 403 at 2]. In his March 1, 2024, statement, Mr. Gray repeatedly expressed his hesitancy to divulge information:

> Mr. Gray: I ain't saying nothing. I'm just going to tell you . . . my side. Anything else I can't -- I ain't saying nothing about that.
>
> . . .
>
> Mr. Gray: . . . That -- that's just -- things you just don't say, you know.
>
> . . .
>
> Mr. Gray: I know it -- I know it will hurt me in the long run, but -- I just don't want to take nobody else out, though, like that.
>
> . . .
>
> Mr. Gray: -- never know what can happen.
>
> . . .
>
> Mr. Gray: By telling on somebody, you know. You never know. Like -- it won't be

good.

Mr. Gunther: Are you worried about your well-being?

Mr. Gray: Not really. I just don't want to be labeled as that. You know, like -- because eventually they will find out, you know. Because only certain people know certain stuff. So -- no.

Mr. Gunther: Gotcha.

Mr. Gray: And I don't want to be put in that like that. It's just too much at risk, you know. You never know what can happen.

[ECF 402-1 at 20–23]. Accordingly, the alleged inconsistency does not indicate unreliability, particularly in light of Mr. Gray's candid testimony. [*See* ECF 461 at 12–13 (admitting he denied cooperating with law enforcement during a recorded telephone call while incarcerated but explaining that he gave an initial statement omitting key details followed by a "more thorough" subsequent statement)].

Nor does Mr. Gray's denial to his sister regarding the amount he attributed to Mr. Thompson indicate inconsistency or unreliability. As previously acknowledged, Mr. Gray was concerned with the potential consequences of his assistance. [*See also* ECF 403 at 5 ("Anyone who cooperates with law enforcement will not broadcast that fact while he is in jail or through jail calls as this will certainly make him a target.")]. Finally, the fact that Mr. Gray lived in West Virginia for approximately nine months prior to his brother's death does not preclude his ability to see his brother and Mr. Thompson with methamphetamine on approximately five occasions -- even if those occasions occurred "about every three months" as Mr. Thompson alleges. [ECF 402 at 3; *see also* ECF 461 at 42 ("[Mr. Staples:] And you said that happened five times and it happened every three months. That's what you told them at that time back in November, right? A. I guess so. [Mr. Staples:] Yeah. So I'm trying to figure it out. So if it happened five times every three months, that's 15 months, right? [Mr. Boggess:] That's not actually 15 months. I mean, it could be

20

at the beginning of a month. It could be the middle of -- if you count the first time you saw it, and then three months later[.]"), 62 ("[Mr. Boggess:] . . . So in that year, you saw him about five times? A. That's correct.")].

Inasmuch as Mr. Thompson has failed to meet his burden to illustrate unreliability, *see Mondragon*, 860 F.3d at 233, the Court accepts Mr. Gray's statements to law enforcement as reliable.

### b. 50 Pounds of Methamphetamine, 680.4 Grams of Methamphetamine, and 85.05 Grams of Fentanyl

Despite the foregoing analysis, reliability is not certainty. *See Bell*, 667 F.3d at 441 ("[W]hen the approximation is based only upon 'uncertain' witness estimates, district courts should sentence at the low end of the range to which the witnesses testified." (quoting *Sampson*, 140 F.3d at 592)); *see also Williamson*, 953 F.3d at 273 ("District courts must . . . exercise caution in estimating drug quantity at sentencing[] and not attribute speculative or scantily supported amounts to defendants.").

As reflected in the PSR, Mr. Gray stated to law enforcement: (1) Joshua Gray and Mr. Thompson "traveled together to 're-up' on methamphetamine," (2) Mr. Gray witnessed "Joshua Gray and Thompson with approximately 10 pounds of methamphetamine on approximately five occasions," [PSR ¶¶ 24, 25], and (3) following the death of his brother Mr. Thompson "continued to provide quantities of methamphetamine and fentanyl to John Gray to distribute for approximately three months," including "one ounce of methamphetamine approximately twice weekly for three months" and "one ounce of fentanyl, once monthly for three months." [PSR ¶ 26].

Mr. Gray's testimony did little to buttress the attributed amounts. Regarding the 50 pounds or 22,680 grams of methamphetamine, Mr. Gray testified as follows:

21

[Mr. Boggess:] And when you said that you would see large quantities, how much did you estimate those quantities to be?

A. A -- pounds.

[Mr. Boggess:] How many pounds?

A. Like 5. Five to 10.

[Mr. Boggess:] Five to 10? And how many times would you -- did you say you saw that in total?

A. A couple.

[Mr. Boggess:] A couple?

A. Like three, yeah.

. . .

[Mr. Boggess:] Do you remember telling them whether or not you saw it more than a couple of times?

A. I could have, but it's been a while.

[Mr. Boggess:] But you know for certain that you saw them with large quantities of drugs on more than one occasion?

A. That's correct.

. . .

[Mr. Staples:] . . . 5 to 10 pounds, a couple of times, right?

A. That's correct.

[Mr. Staples:] In the statement that you gave, sir, did you tell them that he gave way more than that?

A. I'm not for sure.

[Mr. Staples:] Well, you -- you told them that he gave -- you saw him with 10 pounds, five times[.]

. . .

[Mr. Staples:] You said that it happened ten times. I'm sorry -- five times, 10 pounds each time, and it happened every three months. That's what you said in that statement, right?

A. I think so.

[Mr. Staples:] All right. And now you come in here today and you said it was -- what did he say -- 5 to 10 pounds and it happened two times, right?

A. I guess so.

. . .

[Mr. Staples:] And you said that happened five times and it happened every three months. That's what you told them at that time back in November, right?

A. I guess so.

. . .

[Mr. Staples:] Over the time period, here today you said it was, what, two times, 5 to 10 pounds, right?

A. I guess so.

[Mr. Staples:] That's what you said, right? So you really don't know how much it was, do you?

A. I can't say that.

. . .

[Mr. Boggess:] . . . [Y]ou said about five times that you saw him with 10 pounds of drugs and it was about every three months; is that correct?

A. That is correct.

. . .

Q. So you saw Mr. Thompson and your brother about five times with about 10 pounds of methamphetamine?

A. That's correct.

. . .

23

[Mr. Boggess:] So in that year, you saw him about five times?

A. That's correct.

Q. With about 10 pounds?

A. That's correct.

[ECF 461 at 8–9, 40–43, 61–62].

Regarding the 680.4 grams of methamphetamine and 85.05 grams of fentanyl, Mr. Gray testified as follows:

[Mr. Boggess:] I had asked you once your brother passed away who you were getting the drugs from. And you indicated -- who did you say you were getting the drugs from?

A. Thompson.

. . .

Q. And did you continue to get drugs from Mr. Thompson -- for how long -- how long did you continue to get drugs from Mr. Thompson?

A. Not long.

Q. Was it until he got arrested?

A. I would say.

[*Id.* at 10–11].

Accordingly, the low end of the testimony regarding the 50 pounds or 22,680 grams of methamphetamine amounts to 10 pounds (five pounds on two instances) or 4535.9237 grams, *see Couple*, oed.com, www.oed.com/dictionary/couple_n (last visited May 28, 2026) ("A union of two; a pair."). Mr. Gray's testimony omitted discussion regarding the 680.4 grams of methamphetamine and 85.05 grams of fentanyl previously attributed to Mr. Thompson in Mr. Gray's statements to law enforcement. Inasmuch as those amounts are approximations provided by Mr. Gray without further support, the Court declines to attribute the 680.4 grams of

24

methamphetamine, and 85.05 grams of fentanyl to Mr. Thompson. *See Bell*, 667 F.3d at 441 (cautioning courts against attributing "'uncertain' witness estimates" to defendants); *Williamson*, 953 F.3d at 273 (citation omitted) (acknowledging "[d]istrict courts enjoy considerable leeway in crafting" an approximation of the controlled substances at issue when calculating drug quantity for Guidelines purposes but cautioning courts against attributing "speculative" drug weight to defendants).

### c. Drug Calculation Following Variance

The Court is bound to accurately calculate Mr. Thompson's offense level. However, the Court notes -- as a result of the "Court's usual practice to sentence ["ice"] in accordance with the [G]uidelines variance process to . . . Methamphetamine" -- the above ultimately makes no appreciable difference in the calculation of the sentencing range. [ECF 461 at 81–82 (noting "the Court's usual practice of converting ice to [methamphetamine] when it comes to methamphetamine for purposes of the guidelines calculations")]. After accounting for the methamphetamine/"ice" disparity, Mr. Thompson's base offense level would be 32 in all circumstances.

25

| Attributed Amounts | Calculations | BOL after Variance |
|---|---|---|
| Controlled Buys | 446.10 G + 439.50 G + 436.41 G + 443.4 G = 1,765.41 G<br><br>If "ice:" 1,765.41 G x 20 KG = 35,308.2 KG CDW.<br>At least 30,000 KG but less than 90,000 KG = BOL 36 [U.S.S.G. §2D1.1(c)(2)].<br><br>If methamphetamine: 1,765.41 G x 2 KG = 3,530.82 KG CDW.<br>At least 3,000 KG but less than 10,000 KG = BOL 32 [U.S.S.G. § 2D1.1(c)(4)]. | 32 |
| Controlled Buys<br>10 Pounds Methamphetamine | 446.10 G + 439.50 G + 436.41 G + 443.4 G = 1,765.41 G<br>10 Pounds Methamphetamine = 4,535.9237 G<br><br>4,535.9237 G - 1,765.41 G "ice" (to avoid double counting) = 2,770.5137 G<br><br>2,770.5137 x 2 KG = 5,541.0274 KG CDW.<br>At least 3,000 KG but less than 10,000 KG = BOL 32 [U.S.S.G. § 2D1.1(c)(4)]. | 32 |
| Controlled Buys<br>10 Pounds Methamphetamine<br>680.4 Grams Methamphetamine<br>85.05 Grams Fentanyl | 446.10 G + 439.50 G + 436.41 G + 443.4 G = 1,765.41 G<br><br>10 Pounds Methamphetamine = 4,535.9237 G<br>680.4 Grams Methamphetamine = 680.4 G<br>Methamphetamine total = 4,535.9237 G + 680.4 G = 5,216.3237 G<br><br>(4,535.9237 G + 680.4 G = 5,216.3237 G) - 1,765.41 G "ice" (to avoid double counting) = 3,450.9137 G<br><br>85.05 Grams Fentanyl: 85.05 G x 2.5 KG = 212.625 KG CDW<br><br>3,450.9137 x 2 KG = 6,901.8274 KG CDW + 212.625 KG CDW (from fentanyl) = 7,114.4524 KG CDW.<br>At least 3,000 KG but less than 10,000 KG = BOL 32 [U.S.S.G. § 2D1.1(c)(4)]. | 32 |

Accordingly, consistent with the above analysis, the Court **SUSTAINS IN PART** and **OVERRULES IN PART** Mr. Thompson's objections to paragraphs 24–26, 28–30, 35, and

26

37–40 of the PSR.[4]

## III.

Based on the foregoing discussion, the Court **SUSTAINS** Mr. Thompson's objection to the application of the career offender enhancement. The Court further **SUSTAINS IN PART** and **OVERRULES IN PART** Mr. Thompson's objections relating to his attributable drug weight.

The Clerk is directed to send a copy of this written opinion and order to the Defendant and his counsel, to the United States Attorney, to the United States Probation Office, and to the United States Marshal.

ENTER:  May 28, 2026

Frank W. Volk
Chief United States District Judge

---

[4] Two outstanding objections remain. Mr. Thompson objects to paragraph 20, which notes another co-defendant stated he "was waiting on Daemien Thompson to bring the remaining out" and paragraph 9, which states "it appears Whittenberg may have received his drugs from Thompson." The first is **OVERRULED** inasmuch as the statement is audible in the video footage obtained by the confidential informant. The second is **OVERRULED** inasmuch as it does not impact the Guidelines and is supported by Mr. Gray's statements to law enforcement.

27